**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| JAMIE KEEGAN, | ) | CASE NO. 3:24-CV-1662 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

## I.    INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Jamie Keegan's application for Disability Insurance Benefits (DIB). Mr. Keegan seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (ECF No. 8.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision denying Mr. Keegan's application for benefits.

## II.    PROCEDURAL HISTORY

On March 22, 2022, Mr. Keegan filed an application to the agency, seeking DIB. (Tr. 205.)[2] He claimed that he became disabled on March 2, 2021. (*Id.*) He identified four disabling

---

[1] Martin O'Malley resigned as Commissioner of Social Security in November 2024. Carolyn W. Colvin served as Acting Commissioner of Social Security from November 2024 to January 2025. Michelle A. King thereafter served as Acting Commissioner until February 2025. Leland C. Dudek is currently serving as Acting Commissioner.

[2] The administrative transcript appears at ECF No. 7. The Court will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 43"). The Court will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 587").

conditions: (1) major depressive disorder – "[severe]/recurrent"; (2) anxiety; (3) attention-deficit/hyperactivity disorder; and (4) bipolar disorder. (Tr. 235.)

Mr. Keegan's application was denied at the initial administrative-review level (Tr. 91) and again upon reconsideration (Tr. 100.)

Mr. Keegan then requested a hearing with an ALJ. (Tr. 112.)

The ALJ held a hearing on June 20, 2023. (Tr. 55–83.) Mr. Keegan testified and was represented by counsel at the hearing. (*See id.*)

The ALJ issued a decision on July 14, 2023, finding that Mr. Keegan was not disabled. (Tr. 27–43.) Mr. Keegan asked the SSA Appeals Council to review that decision. (Tr. 202–03.)

On June 10, 2024, the Appeals Council denied Mr. Keegan's request to review the ALJ's decision. (Tr. 13–18.) The Appeals Council granted Mr. Keegan additional time to file a civil action in this Court. (Tr. 1–2.)

Mr. Keegan filed his complaint seeking judicial review of that decision on September 27, 2024. (Compl., ECF No. 1.) He raises the following assignment of error:

> The Commissioner erred as a matter of law by improperly evaluating the medical opinion of Plaintiff's treating provider, including by failing to incorporate limitations from a medical opinion the ALJ found to be persuasive.

(Pl.'s Merit Br., ECF No. 9, PageID# 587.)

## III.    FACTUAL BACKGROUND

### 1.    <u>Personal, Educational, and Vocational Experience</u>

Mr. Keegan was born in 1989 and was 32 years old on the date of his application. (Tr. 58.) He graduated high school and completed some college courses. (Tr. 59.) He previously worked in factories and warehouses, running machines and assembling parts. (Tr. 60–63.) He was also employed at a paving company, where he worked with asphalt and assisted with sealcoating.

(Tr. 64.) He lives with his wife and two children (a seven-year-old and a three-year-old). (Tr. 58.) He has a driver's license and is able to drive. (Tr. 59.)

      2.  **Function Reports**

Mr. Keegan filled out a function report on April 5, 2022. (Tr. 267–75.) He wrote that his depression and anxiety were "so high" that it was "hard to function or to think straight." (Tr. 267.) He "jitter[s] and twitch[es]" during the day. (Tr. 269.) He has difficulty staying asleep, as he wakes up every two to three hours "in a panic." (*Id.*) He does not go outside the house very often. (Tr. 271.) He is able to drive a car, but if he goes out alone, his "anxiety kicks in" and he gets "worked up." (*Id.*)

With effort, he is able to take care of his children during the day while his wife works. (Tr. 269.) He has no problems seeing to his hygiene and personal care, except that he needs to be reminded to shave and shower and, sometimes, to take medicine. (Tr. 269–70.) He feeds his children during the day but does not prepare any meals; he "get[s] very impatient" preparing meals "and [his] anxiety kicks in." (Tr. 270.)

With encouragement, he is able to do laundry, clean dishes, and mop once a week for about two hours. (*Id.*) He is able to pay bills and count change, but he gets "shaky" and antsy when handling money. (Tr. 271.) He listens to music every day. (Tr. 272.) He sometimes speaks with others on the phone or over text messages, but rarely and only to "talk about [his] problems." (*Id.*) He has problems getting along with people because "people take [him] the wrong way so [he] get[s] upset." (*Id.*) He gets "overwhelmed," a state that he has found affects his memory, ability to complete tasks, concentration, understanding, and ability to get along with others. (Tr. 273.) These difficulties cause him to feel depressed because he feels he is "not normal." (*Id.*)

Mr. Keegan estimated that he could pay attention for only two minutes at a time. (*Id.*) He follows written instructions "okay," but when given spoken instructions he forgets "what [he] was asked to do." (*Id.*) He gets along with authority figures "okay." (*Id.*)

Mr. Keegan wrote that he does not handle stress or changes in his routine well. (Tr. 274.)

In August 2022, Mr. Keegan wrote that he has "had no interest in anything, even food or eating." (Tr. 289.) He said that he has had difficulties getting out of bed and "completing task[s] from day to day." (*Id.*)

### 3. Relevant Hearing Testimony

#### a. *Mr. Keegan's Testimony*

Mr. Keegan testified that his anxiety and depression keep him from being able to work. (Tr. 65.) He identified that the "biggest factor" is his ability to focus; he is not able to concentrate and has "so many racing thoughts." (Tr. 67.) He described doing his best to take care of his children during the day but admitted that at certain points he "break[s] down" and cries on the couch. (Tr. 65.) His anxiety then turns into depression, during which he has "major suicidal thoughts." (*Id.*) When he is depressed, it can be hard to want to even get up and do things around the house. (Tr. 67.) He estimated that three days per week, his depression is bad enough that he does not want to get out of bed. (Tr. 74.) He has been seeing a case manager, psychiatrist, and therapist for two years. (Tr. 74–75.)

He is able to sit all day; in fact, when depressed, it can be "hard to even want to get up" do things around the house. (Tr. 67.) He sleeps six to eight hours a night. (*Id.*) He does not need help seeing to his hygiene, but he is not able to cook because he does not "know how." (Tr. 67–68.) He is able to help with dishes but cannot help with laundry because he "get[s] triggered . . . and the depression sets in" after he starts the laundry. (Tr. 68.)

Mr. Keegan does not have any hobbies; he has never had hobbies. (Tr. 68.) He participates in in-person group therapy three days a week. (Tr. 69.) He finds it difficult sometimes to talk in these sessions because he gets "nervous." (*Id.*)

Mr. Keegan does not manage his own medication; the group-therapy clinic fills a medication planner with his medicine once a week. (Tr. 70.) There are days when Mr. Keegan misses his afternoon dose of medicine because he is crying on the couch. (*Id.*) But, for the most part, he is compliant with his medication. (*Id.*)

Mr. Keegan testified that he can drive for up to an hour, after which he becomes "antsy and wanting to look around and getting distracted." (Tr. 59.)

Mr. Keegan estimated that he could stand for up to an hour at a time and walk for a mile. (Tr. 65.) No doctor has given him lifting restrictions, but he has limited himself to lifting items weighing less than 15 pounds. (Tr. 66.) He candidly described that his physical limitations did not result from his mental-health conditions, but rather stemmed from generally "being out of shape." (Tr. 67.)

In 2021, Mr. Keegan worked at a business for "[j]ust a day," because his "anxiety had got too bad" to continue. (Tr. 71.) He was able to sit through video training without a problem, but he could not focus when he got out on the floor, which "sent [him] into a spiral of depression." (Tr. 72.) He also was only able to work at a gas station for a day and a half before his anxiety caused him to leave. (*Id.*) He worked at a couple factories for a day each, too, but he was not able to keep up with the expected production rate. (*Id.*)

### b. *Vocational Expert's Testimony*

Robert Mosley testified as a vocational expert. (Tr. 75.) He classified Mr. Keegan's past work as that of a small parts assembler I (DOT 706.684-022), small products assembler II (DOT

739.087-030), warehouse worker (DOT 922.687-038), painter helper (DOT 741.687-014), and construction worker II (DOT 869.687-026). (Tr. 76.)

The ALJ asked the expert to imagine a hypothetical person with Mr. Keegan's age, education, and work experience with the residual functional capacity for work at any exertional level but who is further limited as follows: the individual can understand, remember, and carry out simple instructions for work that does not require a specific production rate or hourly quota; the individual is capable of using judgment to make simple, work-related decisions with occasional changes in a routine work setting; and the individual is capable of occasional interaction with supervisors and occasional, brief, and superficial interaction with the general public and coworkers. (Tr. 77–78.) The ALJ explained that, by "superficial," he meant that the individual could be in proximity to others, exchange greetings, and engage in discussions that do not require persuasion or involve tandem tasks that extend beyond a 30-day training period. (*Id.*)

The expert opined that such a person would not be able to perform any of Mr. Keegan's past relevant work, but that the person would be able to perform other jobs that exist in the national economy, such as cleaner II (DOT 919.687-014), cleaner/housekeeping (DOT 323.687-014), and laundry worker II (DOT 361.685-018). (Tr. 78.)

The ALJ next asked the expert to limit the hypothetical person from his first question to only light work. (*Id.*) The expert opined that such a person could perform the work of a cleaner/housekeeping, cafeteria attendant (DOT 311.677-010), or folder/clothing (DOT 369.687-018). (Tr. 79.)

The ALJ next asked the expert to limit the hypothetical person to sedentary work. (Tr. 79.) The expert opined that the person could perform the work of a surveillance system monitor (DOT 379.367-010), lens inserter (DOT 713.687-026), or final assembler (DOT 713.687-018). (Tr. 80.)

The ALJ next asked the ALJ to consider that the hypothetical person from the first hypothetical would be off task for more than 15 percent of the work period. (Tr. 80.) The expert opined that this limitation would be work-preclusive, as employers will not tolerate employees who are off-task for 15 percent or more of the workday. (*Id.*) The expert testified that employers will tolerate up to one absence per month. (Tr. 80–81.)

### 4. <u>State Agency Medical Consultants</u>

A disability examiner (Kurt Dickman) and a psychologist (Courtney Zeune, Psy.D.) reviewed Mr. Keegan's claim at the initial administrative level. (Tr. 84–91.) Dr. Zeune concluded that Mr. Keegan has moderate limitations in the ability to interact with others and to concentrate, persist, and maintain pace. (Tr. 86.) Dr. Zeune identified that Mr. Keegan has mild limitations in the ability to adapt or manage himself and to understand, remember, and apply information. (*Id.*) She found Mr. Keegan's statements about the intensity, persistence, and functionally limiting effects of his mental-health conditions to be only partially supported by the record. (Tr. 87.) She stated that medical records showed that Mr. Keegan did display "fidgety behavior" and rapid speech, but also showed that he has normal attention despite complaining of poor focus. (*Id.*)

Dr. Zeune concluded that Mr. Keegan had moderate functional limitations with respect to his ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace; (4) interact appropriately with the general public, (5) accept instructions and respond appropriately to criticism from supervisors; and (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 88.) She concluded that he had no further significant functional limitations. (*Id.*) Dr. Zeune explained that

she found Mr. Keegan capable of interacting with others on a brief, superficial basis if those interactions do not include conflict resolution or negotiation. (*Id.*)

Based on these opinions, the agency concluded that Mr. Keegan had the residual functional capacity to perform unskilled work at any exertional level, such that he could perform the work required of a "stuffer" (DOT 731.685-014), "garment sorter" (DOT 222.687-014), or "shaper and presser" (DOT 583.685-102). (Tr. 89.)

Therefore, the consultants concluded that Mr. Keegan was not disabled. (Tr. 90.) In a letter explaining this decision, the SSA wrote that the evidence shows that Mr. Keegan has some mental problems but is "still able to think, communicate, and carry out routine tasks" such that he is "capable of work that is simple and repetitive." (Tr. 105.)

In seeking reconsideration of that decision, Mr. Keegan provided additional information. Specifically, he informed the agency that he had been admitted to an inpatient psychiatric facility on May 2, 2022, "due to suicidal ideations." (Tr. 277.) He wrote that, after being discharged, he has had days of "higher anxiety and depression" and other days where his symptoms have been the same as before the hospitalization. (*Id.*) He wrote that he has lost interest in the things he used to do and is unable to take care of his personal hygiene. (Tr. 279.) He said that he is able to "push" himself to care for his children and meet their needs. (*Id.*) He described he felt he would not be reliable or dependable at work and "[kept] getting let go because of it." (Tr. 94.) He acknowledged that he does not "want to feel like a failure trying" to work. (*Id.*)

At the reconsideration level, a disability examiner (Joseph Burrus) and a psychologist (Karla Delcour, Ph.D.) affirmed the finding that Mr. Keegan is not disabled. (Tr. 92–100.) Dr. Delcour concurred that Mr. Keegan retained the ability to carry out simple and multi-step tasks in the absence of production or quota demands and to interact superficially with others. (Tr. 97.) She

8

concluded that the prior administrative findings were consistent with the medical evidence. (*Id.*) Based on these findings, the agency consultants concluded that Mr. Keegan had the residual functional capacity to perform the work of a "stuffer" (DOT 731.685-014), "garment sorter" (DOT 222.687-014), or "shaper and presser" (DOT 583.685-102) and was not disabled. (Tr. 98–99.)

In a letter explaining this decision, the SSA wrote that Mr. Keegan "may feel depressed and anxious at times" but is "still able to think clearly, communicate with others as needed, and act in your own interest" to the extent that he is "able to complete [his] normal daily activities without supervision." (Tr. 111.)

### 5. Relevant Medical Evidence

The record in this case spans from January 2022 to March 2023. (*See, e.g.*, Tr. 316, 461.) The medical records reflect that Mr. Keegan has sought routine medication and psychotherapy treatment during that time period. (*See generally* Tr. 316–465.) While this appeal concerns one specific medical opinion from December 2022, the Court notes that it has reviewed each of the medical records in the file. They corroborate that Mr. Keegan has reported feeling "down" most of the time, with varying energy levels and pronounced irritability and inability to concentrate, and with a history of suicidal ideation. (*See, e.g.*, Tr. 316, 318–20, 324, 340, 346, 352, 358, 376, 407, 412, 416, 430, 432, 435, 437, 456, 469, 471, 484, 502, 504, 509, 540.) He reported anxiety with respect to various stressors, including interactions with family. (*See, e.g.*, 376, 378, 390, 396, 398, 400, 402, 405, 416, 418, 422, 434, 439, 441 (describing alleged domestic violence), 443, 461, 489, 498, 520, 542.)

Mr. Keegan's mental status examinations have largely been normal, except for a notably depressed and anxious or irritable mood and racing thoughts, and occasional paranoia. (*See* 318, 321–22, 325–26, 329–30 (also "fidgety"), 333, 341, 347–48, 353–55, 359–61, 383–85, 392–93,

9

408–09, 423–424, 447–48, 477 & 514 & 535 (also "disheveled"), 485, 530–31.) Mr. Keegan has endorsed feeling better with medication and expressed optimism with respect to his ability to obtain and maintain employment (*See, e.g.*, Tr. 318, 382, 398, 446, 525, 529.)

Mr. Keegan was admitted to a hospital in May 2022 for suicidal intent. (Tr. 332.) While in the hospital, he socialized appropriately with others and his symptoms gradually improved. (Tr. 333.) He was discharged in stable condition. (*Id.*)

On December 15, 2022, Ms. Bernal completed a medical source statement. (Tr. 450–55.) After identifying Mr. Keegan's diagnosis (bipolar disorder) and symptoms—including, among others, recurrent severe panic attacks and persistent disturbances of mood or affect—Ms. Bernal was asked to identify whether Mr. Keegan's mental and emotional capabilities were affected to the extent that he could not "satisfactorily perform" a list of work activities "independently, appropriately, effectively and on a sustained basis in a regular work setting." (Tr. 450–53.) She did not identify any work area in which Mr. Keegan would be unable to meet competitive work standards. (Tr. 452–53.) However, Ms. Bernal identified that Mr. Keegan has a "serious" limitation in a number of work areas.[3] (*Id.*) Ms. Bernal was asked to explain these "serious" limitations and detail the clinical findings that support those limitations; she did not provide any information in response to that request. (Tr. 453.) She further did not identify "stress tolerance" as "an issue."

---

[3] Those were with respect to the ability to (1) remember "work-like procedures," (2) maintain attention for a two-hour segment, (3) work in coordination with or proximity to others without being unduly distracted, (4) make simple work-related decisions, (5) complete a normal workday and workweek without interruptions from psychologically based symptoms, (6) get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, (7) respond appropriately to changes in a routine work setting, (8) deal with normal work stress, (9) understand and remember detailed instructions, (10) carry out detailed instructions, (11) set realistic goals or make plans independently of others, (12) deal with stress of semiskilled and skilled work, (13) interact appropriately with the general public, (14) maintain socially appropriate behavior, (15) adhere to basic standards of neatness and cleanliness, and (16) travel in unfamiliar places. (Tr. 452–53.)

(Tr. 454.) But she opined that Mr. Keegan could be anticipated to be absent around two days per month on average because of his limitations (*Id.*)

## IV.    DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ determined that Mr. Keegan had not engaged in substantial gainful activity since March 2, 2021. (Tr. 33.)

The ALJ further determined that Mr. Keegan has the following severe impairments: (1) anxiety; (2) attention-deficit/hyperactivity disorder (ADHD); (3) major depressive disorder; and (4) bipolar disorder. (*Id.*)

The ALJ next found that Mr. Keegan does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Mr. Keegan had the residual functional capacity to perform a full range of work at all exertional levels, except that (1) he can understand, remember, and carry out simple instructions for work not requiring a specific production rate or hourly quota (like assembly line work); (2) he is capable of using judgment to make simple work-related decisions, with occasional changes in a routine work setting; and (3) he is capable of occasional interaction with supervisors and occasional, brief, and superficial interactions with coworkers and the general public. (Tr. 35.) The ALJ clarified that "superficial interactions" means that Mr. Keegan is able to "be in proximity of others," "exchange greetings," "engage in discussions that do not require persuasion or involve tandem tasks that extend beyond a 30 day training period." (*Id.*)

The ALJ next determined that Mr. Keegan was unable to perform his past relevant work as a small parts assembler, small products assembler, warehouse worker, painter helper, or

construction worker, relying on the vocational expert's testimony that an individual with Mr. Keegan's RFC could not perform the work required by that position. (Tr. 41–42.)

However, the ALJ determined that—considering Mr. Keegan's age, education, work experience, and residual functional capacity—there are jobs that exist in significant numbers in the national economy that he could perform, including work as a "cleaner II" (DOT 919.687-014), "cleaner, housekeeping" (DOT 323.687-014), or "laundry worker" (DOT 361.685-018).[4] (Tr. 42–43.)

Accordingly, the ALJ determined that Mr. Keegan was not disabled. (Tr. 43.)

## V.      LAW AND ANALYSIS

### A.      Standard of Review

Whether reviewing a decision to deny SSI benefits (undertaking the review authorized by 42 U.S.C. § 1383(c)(3)) or a decision to deny disability insurance benefits (reviewing under 42 U.S.C. § 405(g)), the Court uses the same standard of review. *See* 42 U.S.C. § 1383(c)(3) (final determinations under 42 U.S.C. § 1383 "shall be subject to judicial review as provided in [§] 405(g) . . . to the same extent as . . . final determinations under [§] 405 . . . .").

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*). The Court's review "is limited to determining whether the Commissioner's decision is

---

[4] These jobs refer to entries in the U.S. Department of Labor's *Dictionary of Occupational Titles*. The DOL no longer publishes the tool—*see Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014)—but the most recent version, from 1991, is available online through the DOL's Office of Administrative Law Judges Law Library. *Dictionary of Occupational Titles—Fourth Edition, Revised 1991*, U.S. DEPT. OF LABOR OFF. OF ADMIN. L. JUDGES, https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT.

supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983).

In addition to considering whether the Commission's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA failed to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

**B.     Standard for Disability**

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform work in the national economy. *Id.*

**C.     Analysis**

Mr. Keegan contends that the ALJ erred at Step Five when crafting the RFC, arguing that the ALJ failed to incorporate the functional limitations described by Ms. Bernal in her December 2022 medical source statement. (Pl.'s Merits Br., ECF No. 9, PageID# 589–90.) Mr. Keegan points to Ms. Bernal's finding that he had a "serious" limitation with respect to the ability to respond appropriately to changes in a routine work setting and deal with normal work stress. (Tr. 452.) He argues that the ALJ should have included a "low stress work" limitation in the RFC. (Pl.'s Merits Br., ECF No. 9, PageID# 591.) He complains that the ALJ did not explain why such

14

a limitation was not included in the RFC. (*Id.* at PageID# 591–92.) He points out that the ALJ concluded that Mr. Keegan had medically-supported "reduced stress tolerance." (Tr. 34.)

Mr. Keegan argues that the ALJ similarly failed to incorporate or explain why the ALJ did not adopt a "serious" limitation with respect to the ability to maintain attention for two-hour segments. (*See* ECF No. 9, PageID# 593.)

Finally, Mr. Keegan contends that the ALJ should have included these limitations in the hypotheticals proposed to the vocational expert, arguing that the additional limitations "could have easily altered the vocational expert's analysis o the type of work [he] could perform." (ECF No. 9, PageID# 595.)

An individual's residual functional capacity (*i.e.*, the most an individual can still do despite applicable limitations) is an administrative decision reserved for the ALJ. 20 C.F.R. § 1546(c). The ALJ assesses an individual's RFC based on all relevant evidence of record. 20 C.F.R. § 404.1545(a)(1). It is well-established that an ALJ need not discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r of Sec.*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004)) (finding an ALJ need not discuss every piece of evidence in the record). But courts do not hesitate to remand where an ALJ selectively considers only portions of the medical evidence that place that claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See, e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *see also Ackles v. Colvin*, No. 3:14CV00249, 2015 WL 1757474, at *6 (S.D. Ohio Apr. 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Johnson v. Comm'r of Soc. Sec.*,

No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

The Commissioner defends the ALJ's decision, arguing that the ALJ fully accounted for Ms. Bernal's opinion in the RFC and "reasonably translat[ed] Ms. Bernal's more general findings of impairment into vocationally relevant terms." (Def.'s Merits Br., ECF No. 11, PageID# 604.) The Commissioner points out that Ms. Bernal did not identify any areas in which Mr. Keegan would not be able to meet competitive work standards. (*Id.*)

After a careful review, the Court agrees with the Commissioner. In evaluating Ms. Bernal's medical-source statement, the ALJ accurately summarized as follows:

> [Ms.] Bernal, CNP opined that the claimant had serious limitations, but was not precluded from remembering work-like procedures, and making simple work-related decisions. The claimant was similarly seriously limited but not precluded from maintaining attention for two-hour segments. The claimant was seriously limited from completing a normal workday and workweek without interruptions from [symptoms.]"

(Tr. 39.)

After describing other limitations noted in Ms. Bernal's statement, the ALJ found the "balance of the opinion" to be persuasive, noting an exception with respect to Ms. Bernal's opinion that Mr. Keegan would be absent from work twice per month. (*Id.*) The ALJ further explained that Ms. Bernal's opinion—which is that Mr. Keegan had serious but not work-preclusive limitations in a number of work areas—was consistent with that of the state agency physicians, who opined that Mr. Keegan "could carry out simple and multistep tasks without production or quota performance demands." (*Id.*)

The ALJ credited Mr. Keegan's testimony that interacting with others caused his anxiety to worsen, noting accurately that treatment records supported that he was frequently agitated and

16

irritable during treatment sessions. (Tr. 39–40.) The ALJ specifically noted that, during the hearing, Mr. Keegan "showed signs of heightened anxiety . . . including tearfulness." (Tr. 40.) The ALJ thus imposed greater limitations than the state agency consultants proposed, finding "the lack of limitations regarding workplace decision making and workplace changes to be unpersuasive." (*Id.*) The ALJ acknowledged that Mr. Keegan has "reduced stress tolerance and self-management." (*Id.*)

After making the above observations, the ALJ then carefully explained why the RFC was appropriate. The ALJ accurately explained that treatment notes "frequently noted that [Mr. Keegan]'s attention was normal" and he "exhibited numerous periods during which his thought process was logical." (Tr. 40.) His social and emotional reciprocity was described as intact and he engaged in activities that required functional adaptation and self-management, including—significantly—his ability to care for his children during the day while his spouse worked. (*See* Tr. 40–41.)

In other words, the ALJ did not "cherry-pick" evidence to support a finding that Mr. Keegan was not disabled. To the contrary, the ALJ carefully and accurately summarized the medical records in evidence and correctly concluded that Mr. Keegan's reported symptoms were partially, but not fully, consistent with the record evidence. In doing so, the ALJ accurately and comprehensively summarized Mr. Keegan's testimony about his reported symptoms. The ALJ credited his testimony and, based as well on the medical records, imposed greater limitations than those recommended by the state agency consultants.

The ALJ then thoroughly explained why Mr. Keegan's reported functional limitations were only partially consistent with the medical evidence.

17

After engaging in this review, the ALJ concluded that Mr. Keegan retains the ability to follow simple instructions and complete work tasks without the onus of a specific production rate or hourly quota. (Tr. 41.)

While Mr. Keegan is correct that Ms. Bernal identified a number of "serious" limitations, as described further above, her conclusion must be viewed in its appropriate context. Ms. Bernal was asked whether Mr. Keegan's limitations—while "serious"—were significant enough to preclude him from working "independently, appropriately, effectively and on a sustained basis in a regular work setting." (Tr. 450–53.) She did not opine that any of his limitations would be work-preclusive. (*See id.*)

Therefore, the Commissioner is correct that the ALJ did not leave out—without explanation—a functional limitation identified by a treating medical source. To the contrary, the ALJ adopted functional limitations consistent with Ms. Bernal's opinions, with the exception of her opinion on absenteeism, and went even further than Ms. Bernal would have. While Ms. Bernal did not identify "stress tolerance" as "an issue" (*see* Tr. 454), the ALJ specifically found that Mr. Keegan had "reduced stress tolerance" and accommodated that limitation by limiting Mr. Keegan to work requiring only simple work-related decisions, with occasional changes, and with only occasional interaction with supervisors and occasional, brief, and superficial interactions with coworkers and the general public.

In summary, the ALJ's decision addresses Mr. Keegan's subjective complaints and explains why those complaints are not entirely consistent with the record. *See Pifer v. Comm'r of Soc. Sec.*, Case No. 1:21-CV-00314-CEH, 2022 WL 1521911 (N.D. Ohio May 13, 2022) (affirming where the ALJ considered the claimant's subjective allegations and gave a thorough explanation as to why he found those allegations inconsistent with the medical evidence). The

18

Court is convinced that the ALJ considered all the relevant evidence and that a reasonable mind might accept the record evidence as adequate to support the ALJ's findings. The RFC is more restrictive than the opinions of the state agency consultants.

To the extent Mr. Keegan believes the ALJ should have weighed the evidence differently and imposed greater limitations, it is not a reviewing court's role to second guess the ALJ's determination. *See Jones*, 336 F.3d at 477. The Court is convinced that there is no compelling reason for the Court to disturb the ALJ's findings. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732 (N.D. Ohio 2005).

The standard for "substantial evidence" is "not high." *Biestek*, 139 S.Ct. at 1154. "The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Mr. Keegan acknowledges that an ALJ is not required to mirror a medical opinion verbatim. (Reply Br., ECF No. 12, PageID# 611.) Here, the Court is convinced that the ALJ adequately acknowledged Mr. Keegan's reduced stress tolerance and concentration limitations (going beyond even what Ms. Bernal supported), and that the ALJ's RFC is reasonable and supported by sufficient evidence.

Accordingly, Mr. Keegan's assignment of error is overruled.

## VI. CONCLUSION

Based on the foregoing, the Court AFFIRMS the Commissioner's decision denying Mr. Keegan's application for benefits.

**IT IS SO ORDERED.**


Dated:  April 7, 2025                                   _/s Jennifer Dowdell Armstrong_
                                                        JENNIFER DOWDELL ARMSTRONG
                                                        UNITED STATES MAGISTRATE JUDGE